**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

KAILAB DAVID HENDRICKSON,

        Defendant.

No. CR 13-4110-MWB

**SENTENCING OPINION AND
STATEMENT OF REASONING
UNDER 18 U.S.C. § 3553(c)**

_____

**TABLE OF CONTENTS**

I.     **INTRODUCTION**............................................................................3

II.    **ANALYSIS** ..................................................................................4
    A.    *Sentencing Methodology* ..................................................... 4
    B.    *Addiction as a Mitigating Factor under § 3553(a)* ......................... 7
        1.    *Addiction and culpability* ................................................ 7
        2.    *Addiction and district courts' post-Gall discretion* ................. 15

III.   **CONCLUSION**............................................................................ 20

> *When science began to study addictive behavior in the 1930s, people addicted to drugs were thought to be morally flawed and lacking in willpower. Those views shaped society's responses to drug abuse, treating it as a moral failing rather than a health problem, which led to an emphasis on punitive rather than preventative and therapeutic actions. Today, thanks to science, our views and our responses to drug abuse have changed dramatically.*[1]

As a federal judge with two decades of experience sentencing drug-addicted criminal defendants, the quote above, from the director of the National Institute on Drug Abuse, evokes both optimism and dismay. On one hand, it reflects society's progress in understanding addiction as a public-health problem. On the other hand, it is a sobering reminder that advances in science continue to outpace advances in law. While science may have changed our views on drug abuse, the law still responds to drug abusers with punitive force, rather than preventative or therapeutic treatment.[2] It is therefore unsurprising that, since 1980, the number of federal prisoners serving drug-related sentences has skyrocketed.[3] In short, the quote above speaks to how far we've come, and how far we've yet to go.

---

[1] Nora D. Volkow, *Preface* to NATIONAL INSTITUTE ON DRUG ABUSE, DRUGS, BRAINS, AND BEHAVIOR: THE SCIENCE OF ADDICTION 1 (2010) [hereinafter *Preface* to DRUGS, BRAINS, AND BEHAVIOR], *available at* http://www.drugabuse.gov/sites/default/files/sciofaddiction.pdf.

[2] *See* David M. Eagleman et al., *Why Neuroscience Matters for Rational Drug Policy*, 11 MINN. J.L. SCI. & TECH. 7, 19 (2010) ("The United States has a history of combating the drug problem with increased law enforcement rather than customized intervention and rehabilitation.").

[3] *See, e.g.*, *Drug Policy*, THE SENTENCING PROJECT, http://sentencingproject.org/template/page.cfm?id=128 (last visited June 11, 2014) (noting that the number of federal prisoners serving drug-related sentences went from 4,700 in 1980 to 94,600 in 2011).

Just as science and the law treat addiction differently, so too do federal judges. In particular, judges disagree about whether a defendant's addiction mitigates his or her culpability, and whether a defendant's addiction may support a downward variance under 18 U.S.C. § 3553(a). I recently attended a seminar for federal district court judges where I was reminded that some judges believe that addiction *cannot* be mitigating because it is so common among defendants, especially those being sentenced for drug crimes. In defending this view, one judge commented: "Addiction in drug cases is not outside the heartland." The "heartland" refers to the "set of typical cases embodying the conduct that [a particular sentencing] guideline describes." U.S.S.G. Ch. 1, Pt. A, intro. comment. 4(b). I respectfully disagree with the view that addiction can be mitigating only if it is outside the heartland or extraordinary. I write to explain my view that drug addiction is generally mitigating, especially in cases, like this one, where the defendant is both young and has been addicted to drugs throughout adolescence and most of his early adulthood.

## I.    INTRODUCTION

Defendant Kailab Hendrickson (Hendrickson) is before me for sentencing. On February 4, 2014, Hendrickson pleaded guilty to one count of possessing stolen firearms, in violation of 18 U.S.C. § 922(j). Specifically, Hendrickson stole 15 firearms—including rifles, shotguns, and a pistol—from a house that he burglarized in August of 2013. Hendrickson hid the firearms at his mother's and step-father's home, where federal agents later discovered them. Hendrickson told the agents that, before the burglary, he had been drinking at a bar, where he got into an altercation with another man. Hendrickson then left the bar and broke into a house looking for drugs. He found 15 guns and a bow instead. He stole the weapons, hid the guns at his relatives' home, and gave the bow to someone else to settle a $400 methamphetamine debt.

Hendrickson is a 23-year-old young man with an unfortunate history of abusing multiple drugs and making impulsive decisions. He began using alcohol, marijuana, and methamphetamine when he was just 14 years old. He admits that he is addicted to both marijuana and methamphetamine. Before his arrest in this case, Hendrickson used marijuana as often as he could, and used methamphetamine daily since 2012. Hendrickson also suffers from ADHD. These facts are uncontroverted.

Along with Hendrickson's drug addictions came criminal behavior. At age 14 and 15, Hendrickson was adjudicated for Burglary 3rd Degree and Possession of Marijuana. At ages 16 and 17, he participated in two outpatient substance abuse programs, but continued abusing drugs. Hendrickson was then placed in a residential substance abuse program where he attempted to deliver methamphetamine to the other participants. Hendrickson was adjudicated for Possession of Methamphetamine with Intent to Deliver, and was committed to a state training school for boys. The training school discharged him one month before his 18th birthday. Hendrickson's poor decision-making continued as a young adult. At ages 21 and 22, he was convicted once for Trespass, three times for Theft in the 5th Degree, and once for Theft in the 3rd Degree—all in addition to his possession-of-stolen-firearms conviction currently before me.

In light of these facts, I must now determine what sentence is appropriate for Hendrickson.

## II.     ANALYSIS

### A.     Sentencing Methodology

In determining a criminal defendant's sentence, I follow the methodology outlined by the Eighth Circuit Court of Appeals:

> The district court should begin "by correctly calculating the applicable Guidelines range." "[T]he Guidelines should be the starting point and the initial benchmark[, but] [t]he

> Guidelines are not the only consideration[.]" The district
> judge should allow "both parties an opportunity to argue for
> whatever sentence they deem appropriate," and then should
> "consider all of the § 3553(a) factors to determine whether
> they support the sentence requested by a party."

*United States v. Hill*, 552 F.3d 686, 691 (8th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 49-50 (2007)) (internal citations omitted).

The Supreme Court has recognized that a party's argument for a sentence outside the calculated Guidelines range may "take either of two forms." *Rita v. United States*, 551 U.S. 338, 344 (2007). A party may "argue *within the Guidelines' framework*, for a departure," *id.*, or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a [different] sentence."[4] *Id.* The Eighth Circuit Court of Appeals has made clear that, while "similar factors may justify either a variance or a traditional departure," *United States v. Woods*, 670 F.3d 883, 888 (8th Cir. 2012), district courts are not limited by the Guidelines' departure policy framework when determining whether and by what extent to vary. *United States v. Chase*, 560 F.3d 828, 832 (8th Cir. 2009); *United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012); *see also United States v. Villareal–Amarillas*, 562 F.3d 892, 898 (8th Cir. 2009) ("The judge is cabined, but also liberated, by the § 3553(a) factors.").

---

[4] As the Eighth Circuit Court of Appeals has explained:

> "'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States*, 553 U.S. 708, 128 S. Ct. 2198, 171 L. Ed. 2d 28 (2008). A variance, on the other hand, is a "non-Guidelines sentence[] based on the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Solis–Bermudez*, 501 F.3d 882, 884 (8th Cir. 2007).

*United States v. Mireles*, 617 F.3d 1009, 1012 n.2 (8th Cir. 2010).

As a matter of procedure, the Eighth Circuit Court of Appeals has instructed that district courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines' structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." *United States v. Washington*, 515 F.3d 861, 866 (8th Cir. 2008).

Applying this methodology here, I first calculate Hendrickson's Guidelines range. Hendrickson's base offense level is 12. U.S.S.G. § 2K2.1(a)(7). He gets a four-level enhancement for possessing between 8 and 24 stolen firearms, *id.* § 2K2.1(b)(1)(B), a four-level enhancement for possessing the stolen firearms in connection with another felony, *id.* § 2K2.1(b)(6)(B), and a three-level reduction for acceptance of responsibility, *id.* §§ 3E1.1(a)-(b). This yields a total offense level of 17. Hendrickson's criminal history score is 8, which puts him in criminal history category IV. Thus, Hendrickson's Guidelines range is 37 to 46 months. Neither party contests these calculations.

Neither party moves for a departure under the Guidelines or a variance under § 3553(a). Instead, the Government requests a sentence at the high end of Hendrickson's Guidelines range, and Hendrickson requests a sentence at the low end. The fact that neither party requests a variance, however, does not limit my discretion to grant a variance. In fact, I have an independent *duty* to weigh the § 3553(a) factors and fashion a sentence that is sufficient, but not greater than necessary, to achieve the goals of federal sentencing. *See Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (noting that the district court has an "independent obligation to exercise its discretion" in fashioning a sentence, even where the parties agree on a sentence). Sometimes my independent analysis results in a lower sentence for a defendant. Other times it results in a higher one, as was the case in another sentencing held the same day as Hendrickson's. At bottom, my concern is fulfilling my obligation to independently

weigh the § 3553(a) factors to determine if a non-Guidelines sentence is appropriate. I analyze those factors, especially those related to Hendrickson's history of addiction, below.

### B.    Addiction as a Mitigating Factor under § 3553(a)

Under § 3553(a), I must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." Section 3553(a)(2) provides:

> The court, in determining the particular sentence to be imposed, shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

In determining whether a sentence is "sufficient, but not greater than necessary," I must consider, among other factors, "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

As I discussed above, Hendrickson's history and characteristics reveal that he has struggled with drug abuse and addiction since age 14. This addiction continued through Hendrickson's young adulthood, as he abused marijuana frequently and methamphetamine daily. Under § 3553(a), I must consider what effect, if any, Hendrickson's addiction should have on his sentence.

### 1.    Addiction and culpability

In considering the impact of Hendrickson's addiction, I begin where this opinion began, recognizing that science offers important insights into how addiction affects people. "As a result of scientific research, we know that addiction is a disease that affects

both brain and behavior."[5]  The fact that addiction is a disease is something that the United States Supreme Court has recognized, at least implicitly, since 1925.  *See Linder v. United States*, 268 U.S. 5, 18 (1925) (noting that addicts "are diseased and proper subjects for [medical] treatment"); *see also Robinson v. California*, 370 U.S. 660, 667 (1962) ("In this Court counsel for the State recognized that narcotic addiction is an illness.  Indeed, it is apparently an illness which may be contracted innocently or involuntarily." (footnotes omitted)).  Today, "[a]ddiction is defined as a chronic, relapsing brain disease that is characterized by compulsive drug seeking and use, despite harmful consequences."[6]  Compulsive drug seeking and use despite harmful consequences certainly characterizes Hendrickson's conduct.  Thus, while addiction was once thought of as merely a moral failure, it is now rightly identified as a serious medical condition.

"[Drug addiction] is considered a brain disease because drugs change the brain—they change its structure and how it works."[7]  These changes are physical, rather than merely psychological:

> Brain imaging studies from drug-addicted individuals show
> physical changes in areas of the brain that are critical to

---

[5] *Preface* to DRUGS, BRAINS, AND BEHAVIOR, *supra*, at 1.

[6] NATIONAL INSTITUTE ON DRUG ABUSE, DRUGS, BRAINS, AND BEHAVIOR: THE SCIENCE OF ADDICTION 5 (2010), *available at* http://www.drugabuse.gov/sites/default/files/sciofaddiction.pdf [hereinafter DRUGS, BRAINS, AND BEHAVIOR].

[7] *Id.*; *see also* Emily R. Murphy, *Paved with Good Intentions: Sentencing Alternatives from Neuroscience and the Policy of Problem-Solving Courts*, 37 LAW & PSYCHOL. REV. 83, 91 (2013) ("Drug abuse and addiction can be described as parallel (and intimately related) tracks of changes in brain plasticity—how cells in the brain are wired together to communicate—and changes in an individual's psychology and behavior. For example, long-term drug taking modifies the availability of neurotransmitter receptors in brain cell membranes, which alters neuronal connections and thus disrupts normal brain functions." (footnote omitted)).

judgment, decisionmaking, learning and memory, and behavior control. Scientists believe that these changes alter the way the brain works, and may help explain the compulsive and destructive behaviors of addiction.[8]

A recent study suggests that drug abuse damages a person's orbitofrontal cortex (OFC)—the brain region responsible for evaluating hasty decisions—impairing the person's judgment, especially regarding a decision's long-term consequences.[9] Damage to the OFC is particularly harmful because "the OFC contributes to a variety of behavioral states and functions, including the processing or reward, emotion and decision making, which are essential components of motivational-directed behavior."[10]

By changing the brain, addiction affects a person's thinking and behavior.[11] While "[t]he initial decision to take drugs is mostly voluntary . . . when drug abuse takes over,

---

[8] DRUGS, BRAINS, AND BEHAVIOR, *supra*, at 7 (footnote omitted).

[9] Rick Nauert, *How Drugs Hijack Decision-Making in the Brain*, PSYCHCENTRAL (Nov. 27, 2012), http://psychcentral.com/news/2012/11/27/how-drugs-hijack-decision-making-in-the-brain/48162.html.

[10] Edythe D. London et al., *Orbitofrontal Cortex and Human Drug Abuse: Functional Imaging*, 10 CEREBRAL CORTEX 334, 334 (2000), *available at* http://cercor.oxfordjournals.org/content/10/3/334.full.pdf+html (internal citation omitted); *see also* Nora D. Volkow, *Preface* to NATIONAL INSTITUTE ON DRUG ABUSE, PRINCIPLES OF DRUG ADDICTION TREATMENT: A RESEARCH-BASED GUIDE v (2012), *available at* http://www.drugabuse.gov/sites/default/files/podat_1.pdf ("Addiction affects multiple brain circuits, including those involved in reward and motivation, learning and memory, and inhibitory control over behavior.").

[11] *See* Mary Holley, *How Reversible Is Methamphetamine-Related Brain Damage?*, 82 N.D. L. REV. 1135, 1136 (2006) ("The personality centers in the midbrain are vulnerable to the toxic effects of all addictive drugs, particularly methamphetamine. These structures include the self-control tract (fasciculus retroflexus, ventral tegmental area), the pleasure center (nucleus accumbens), motivational and motor centers (striatum), centers for emotional control (amygdala), appetite and sleep cycle (reticular activating system), judgment and cognitive processes (frontal lobes), and memory (hippocampus)."

a person's ability to exert self control can become seriously impaired."[12]  "[D]rugs of abuse are characterized as 'hijacking' the neuro-biological mechanisms by which the brain responds to reward . . ."[13]  "When faced with a choice that brings immediate reward, even at the risk of incurring future negative outcomes, including loss of reputation, job, and family, [addicts] appear oblivious to the consequences of their actions."[14]  Stated plainly, addiction biologically robs drug abusers of their judgment, causing them to act impulsively and ignore the future consequences of their actions.  *See* David M. Eagleman et al., *Why Neuroscience Matters for Rational Drug Policy*, 11 MINN. J.L. SCI. & TECH. 7, 26 (2010) ("More than physical dependence, addiction represents changes in the brain that lead to . . . diminished capacity for the control of impulses.").  Hendrickson's criminal conduct clearly reflects his lack of judgment and impulse control.

---

(footnotes omitted)).

[12] DRUGS, BRAINS, AND BEHAVIOR, *supra*, at 7.

[13] Agnes J. Jasinska et al., *Factors Modulating Neural Reactivity to Drug Cues in Addiction: A Survey of Human Neuroimaging Studies*, 38 NEUROSCIENCE AND BIOBEHAVIORAL REVIEWS 1, 3 (2014); *see also* Floyd E. Bloom, *Does Neuroscience Give Us New Insights into Drug Addiction?*, *in* A JUDGE'S GUIDE TO NEUROSCIENCE: A CONCISE INTRODUCTION 42, 42 (Andrew S. Mansfield ed., 2010), *available at* http://www.sagecenter.ucsb.edu/sites/staging.sagecenter.ucsb.edu/files/file-and-multimedia/A_Judges_Guide_to_Neuroscience%5Bsample%5D.pdf ("Addictive drugs act in the brain by increasing the interneuronal signals of dopamine, norepinephrine, or the naturally occurring endogenous opioid in the reward pathway. This increased cellular reward signaling produces a reinforcing effect on the addictive behavior.").

[14] Antoine Bechara, *Decision Making, Impulse Control and Loss of Willpower to Resist Drugs: A Neurocognitive Perspective*, 8 NATURE NEUROSCIENCE 1458, 1458 (2005), *available at* http://dept.wofford.edu/neuroscience/neuroseminar/pdffall2008/a9.pdf; *see also* London, *supra*, at 339 (noting that "drug abusers are likely to make maladaptive decisions when faced with short-term versus long-term outcomes, especially under conditions that involve risk and uncertainty").

Taken together, this scientific evidence speaks to a fundamental issue at sentencing: culpability. One of the goals of sentencing is retribution—the notion that one's punishment should be proportional to his or her offense. *See* Black's Law Dictionary (9th ed. 2009) (defining *lex talionis*—the principle of retribution—as "[t]he law of retaliation, under which punishment should be in kind—an eye for an eye, a tooth for a tooth, and so on—but no more"). Section 3553(a) promotes this goal, requiring that each sentence "reflect the seriousness of the offense . . . [and] provide just punishment for the offense . . . ." 18 U.S.C. § 3553(a)(2)(A). "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149 (1987). And, in evaluating a defendant's personal culpability, I must consider the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). When addiction appears in a defendant's history and characteristics, the question becomes: How does addiction affect culpability?

The answer, at least in most cases, is that addiction mitigates a defendant's culpability. By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences. This is certainly true for Hendrickson, whose criminal history coincides with, and directly relates to, periods of drug abuse. During allocution, in a moment of self-reflection, Hendrickson noted that "drugs clouded my mind and motivated me to do things I would never do had I been sober." Hendrickson, therefore, acknowledges that drugs diminished his capacity to make good decisions—something both defense counsel and the AUSA acknowledge, too.

The capacity to evaluate the consequences of one's actions is central to one's culpability. This is why we consider the defendant who commits a crime during a

momentary lapse in judgment less blameworthy than the defendant who commits a crime after a period of sober calculation. Even the United States Sentencing Guidelines recognize that a defendant's reduced mental capacity may warrant a lesser sentence.[15] *See* U.S.S.G. § 5K2.13 (allowing for downward departures based on a defendant's diminished capacity). But the idea that capacity affects culpability is not limited to sentencing; it echoes throughout the criminal law. The first-degree murderer is more culpable than the second-degree murderer. The defendant acting on free will is more culpable than the defendant acting under coercion. The adult is more culpable than the child. Simply put, we expect those with a better capacity for decision-making to make better decisions.

Additionally, addiction is mitigating for much the same reasons that the United States Supreme Court has recognized youth is mitigating. For example, in *Graham v. Florida*, 560 U.S. 48, 68 (2010), the Court noted that a juvenile's "transgression is not as morally reprehensible as that of an adult" (citations and internal quotations marks omitted). This is because "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of

_____

[15] While the Guidelines allow for downward departures based on a defendant's diminished capacity, the Guidelines expressly preclude such departures if a defendant's diminished capacity "was caused by the voluntary use of drugs or other intoxicants . . . ." U.S.S.G. § 5K2.13. The Guidelines seem to assume that all drug use is voluntary, at least as that term is ordinarily used. But "recent studies have shown that repeated drug use leads to long-lasting changes in the brain that undermine voluntary control." Nora D. Volkow & Ting-Kai Li, *Drug Addiction: The Neurobiology of Behaviour Gone Awry*, 5 NATURE REVS. NEUROSCIENCE 963, 963 (2004). "[A]lthough initial drug experimentation and recreational use might be volitional, once addiction develops this control is markedly disrupted." *Id.* The Guidelines, therefore, appear to incorporate a misinformed view of how addiction affects volition. But, in any event, the Guidelines only preclude *departures* based on a defendant's drug-induced diminished capacity. As I discuss below, this does not constrain my ability to grant a *variance* based on a defendant's addiction.

the brain involved in behavior control continue to mature through late adolescence." *Id.* Similarly, in *Roper v. Simmons*, 543 U.S. 551, 569 (2005), the Court noted that "scientific and sociological studies . . . tend to confirm [that a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions" (citations and internal quotation marks omitted). *See also id.* ("[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." (quoting Jeffrey *Arnett, Reckless Behavior in Adolescence: A Developmental Perspective*, 12 DEVELOPMENTAL REV. 339, 344 (1992))). Based on these findings, the Court held that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham*, 560 U.S. at 68 (citing *Roper*, 543 U.S. at 569).

Just as there are fundamental differences between the juvenile and adult brain, so too are there fundamental differences between the addict and non-addict brain. Because of these differences, addicts, like juveniles, tend to make "impetuous and ill-considered" decisions. Thus, for the same reasons juveniles are generally less culpable, so too are addicts.

This is not to say, however, that addiction is *limitlessly* mitigating. For example, addiction may not be mitigating, or may be less mitigating, where there is no nexus between the defendant's addiction and offense; or where the defendant has had numerous opportunities for treatment and has either declined drug treatment or failed to meaningfully attempt to complete drug treatment. Also, there may be some point at which a defendant no longer gets the "benefit" of addiction-based mitigation—like the defendant who, after sentencing, repeatedly violates his or her terms of supervised release by using drugs or alcohol. Addiction could even be aggravating in certain situations.

Each case must be carefully considered on its own and all of the § 3553(a) factors must be balanced.

In balancing the § 3553(a) factors here, I find that Hendrickson's addiction is mitigating, especially when considered together with Hendrickson's youth. Hendrickson has been addicted to drugs since he was 14 years old. He is now only 23 years old. Hendrickson has abused brain-altering drugs through most of the years during which his adolescent brain was still physically developing.[16] As a result, Hendrickson has sadly, but predictably, made poor decisions based on impulse and immaturity. Letters from Hendrickson's family members, received as Defendant's Exhibit A, confirm this. For example, Hendrickson's mother observed that Hendrickson is "young and immature," that he "has struggled with drugs off and on ever[] since he [] first started using them," and that "drugs had a huge influence on his decision making." Hendrickson's aunt commented that Hendrickson "has always been mentally younger than he looks" and that "he doesn't stop to think about his actions before he does them." These observations are consistent with the scientific evidence discussed above, and they support the conclusion that Hendrickson's addition is mitigating.

The Government concedes that I "can view [Hendrickson's] claimed drug addiction and ADHD impulsivity as mitigating factors in determining [his] sentence" (docket no. 34, at 2). But the Government argues that the aggravating factors in this case—including Hendrickson's serial thievery—outweigh any addiction-based mitigation.

---

[16] Melissa S. Caulum, *Postadolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, 2007 WIS. L. REV. 729, 739 (2007) ("With the advent of magnetic resonance imaging (MRI), however, scientists have found evidence that the brain continues to develop throughout adolescence. The most recent research concludes that both behavioral and cognitive development continues through 'emerging adulthood.'" (footnotes omitted)).

I agree that Hendrickson's criminal history, given his young age, is both troubling and aggravating. But that aggravation is outweighed by related mitigating factors: the fact that half of Hendrickson's criminal history occurred when he was 15 and 16, and the fact that Hendrickson's criminal history is directly related to his addiction. The record also reveals that, when Hendrickson is not under the influence of drugs, he can be a productive citizen; he earned a significant income for someone his age during a brief period of sobriety. Therefore, in my view, the § 3553(a) factors justify a variance of 6 months below the low end of Hendrickson's Guidelines range.

In sum, because addiction is a serious brain disease that diminishes one's capacity to evaluate decisions and regulate behavior, I consider addiction to be a generally and substantially mitigating factor under § 3553(a)(1), weighing in favor of a downward variance here. I next consider, more specifically, district courts' discretion to consider a defendant's addiction in varying below a Guidelines sentence.

### 2. *Addiction and district courts' post-Gall discretion*

The Eighth Circuit Court of Appeals has recognized that a district court may grant a downward variance under § 3553(a) based on a defendant's addiction. But, before 2007, those variances were limited to cases involving "extraordinary circumstances." *See United States v. Hodge*, 469 F.3d 749, 757 (8th Cir. 2006) ("[D]rug addiction is not a proper basis for sentencing a defendant below the advisory Guidelines range, absent extraordinary circumstances."); *United States v. Likens*, 464 F.3d 823, 826 (8th Cir. 2006) ("Age and drug addiction or abuse are not ordinarily extraordinary circumstances [justifying a variance]."); *United States v. Lee*, 454 F.3d 836, 839 (8th Cir. 2006) ("Drug addiction or abuse is not a proper reason to impose a downward variance, absent exceptional circumstances."). In imposing the "extraordinary circumstances" requirement, the Eighth Circuit Court of Appeals relied on 18 U.S.C. § 3553(a)(5), which provides that district courts, "in determining the particular sentence to be imposed, shall

consider . . . any pertinent policy statement . . . issued by the Sentencing Commission . . . ." The policy statement in U.S.S.G. § 5H1.4 provides that "[d]rug or alcohol dependence or abuse ordinarily is not a reason for a downward departure." Because policy statements like § 5H1.4 are "relevant factors" under § 3553(a)(5), the Eighth Circuit Court of Appeals required district courts to articulate extraordinary circumstances justifying an addiction-based variance. *Hodge*, 469 F.3d at 757; *but see Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011) (noting that "a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views" expressed in Guidelines policy statements).

Things changed in 2007, however, when the United States Supreme Court decided *Gall v. United States*, 552 U.S. 38 (2007). In *Gall*, the Court "reject[ed] . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* at 47. The Court also reaffirmed that "the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" *Id.* at 46. Thus, after *Gall*, "a district court need not justify an extraordinary variance with an extraordinary or equally compelling justification . . . ." *United States v. Townsend*, 618 F.3d 915, 921 (8th Cir. 2010) (quoting *United States v. Clay*, 579 F.3d 919, 933-34 (8th Cir. 2009)) (internal quotation marks omitted); *see also United States v. Bain*, 586 F.3d 634, 638 (8th Cir. 2009) ("[T]he district court committed *Gall* error by requiring extraordinary circumstances to justify the requested non-guidelines sentence."); *United States v. Smith*, 573 F.3d 639, 660 (8th Cir. 2009) ("*Gall* made clear that we may no longer require extraordinary circumstances to justify a sentence outside the Guidelines range[.]" (citation an internal quotation marks omitted)); *United States v. McGhee*, 512 F.3d 1050, 1052 (8th Cir. 2008) (per curiam) ("[W]e understand the Court's opinion in *Gall* also to preclude a requirement of extraordinary

circumstances to justify an extraordinary variance[.]" (citation an internal quotation marks omitted)).

Additionally, *Gall*'s directives confirm that district courts need not determine that a case falls outside the heartland in order to vary below a Guidelines sentence, despite the contrary view held by some federal district court judges, which I noted earlier. In other words, there are no "quotas" on variances. Sentences inside and outside of a defendant's Guidelines range are reviewed under the same standard: reasonableness. *Gall*, 552 U.S. at 51. And a district court may not presume that a Guidelines sentence is reasonable. *Id.* at 50; *Rita*, 551 U.S. at 351. Rather, a district court has an "independent obligation to exercise its discretion" to craft a sentence that is sufficient, but not greater than necessary, to achieve § 3553(a)'s goals.[17] *Freeman*, 131 S. Ct. at 2692. In considering the § 3553(a) factors, district courts must make an "individualized assessment" of a particular defendant's case. *Gall*, 552 U.S. at 50; *see also id.* at 52 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). These

---

[17] Discretion is a two-way street. This afternoon, following Hendrickson's sentencing this morning, I imposed a sentence, in a white-collar fraud case, that included some brief incarceration after earlier exercising my discretion to reject a Rule 11(c)(1)(C) plea agreement that included zero incarceration. *See United States v. LaPoint*, No. CR 13-3045-MWB-1, 2014 WL 1711653, at *5 (N.D. Iowa May 1, 2014) (rejecting the Rule 11(c)(1)(C) plea agreement); Sentencing Minutes, United States v. LaPoint, No. CR 13-3045-MWB-1 (N.D. Iowa June 11, 2014), ECF No. 42 (reflecting imposed sentence).

standards are simply inconsistent with the theory that a district court's variance discretion applies only in non-heartland cases.[18]

---

[18] Recently, in *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013), the United States Supreme Court stated that, "[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range" (quoting *Freeman*, 131 S. Ct. at 2692). This statement should not be read to suggest that district courts are obliged to issue Guidelines sentences in the "usual" case. The quote above comes from *Freeman v. United States*, 131 S. Ct. at 2692, and provides in full:

> In the usual sentencing, whether following trial or plea, *the judge's reliance on the Guidelines will be apparent*, for the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range. Even where the judge varies from the recommended range, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense a basis for the sentence.

(Internal citations omitted and emphasis added). In context, the quote appears to be descriptive, rather than prescriptive. At issue in *Freeman* was "whether defendants who enter into 11(c)(1)(C) agreements that specify a particular sentence may be said to have been sentenced 'based on' a Guidelines sentencing range . . . ." *Id.* at 2691. The quote in *Freeman*, therefore, is simply an observation that, absent an 11(c)(1)(C) agreement, it will be "apparent" that the district court relied on the Guidelines in issuing a sentence. The quote recognizes that this will be true *regardless* of whether the district court gives a Guidelines sentence or deviates from the Guidelines. The Court appears to assume that district courts will usually issue a Guidelines sentence. But nothing about the quote above, or *Freeman*'s holding, mandates such a result. In fact, to support the quote, the Court cites to the page of *Gall* stating that "the Guidelines should be the starting point and the initial benchmark" for a defendant's sentence. *Gall*, 552 U.S. at 49. Nothing on that page—or elsewhere in *Gall*—requires that district courts give Guidelines sentences in the "usual" case. As I discussed earlier, *Gall* stands for the opposite proposition— that district courts must exercise their discretion under § 3553(a) independent of the Guidelines and that they need not provide extraordinary reasons for varying from a Guidelines sentence.

Since *Gall*, the Eighth Circuit Court of Appeals has specifically acknowledged that a district court may grant an addiction-based variance even if the defendant is not an "exceptional addict." *See United States v. Parson*, 343 F. App'x 163, 165 (8th Cir. 2009) (remanding a case for resentencing after "[t]he government concede[d] that a requirement of extraordinary circumstances to justify a sentence outside the advisory range is impermissible in light of *Gall*" and that "the court [could] consider whether [the defendant's] drug addiction would justify a further downward variance under § 3553(a)"). Thus, district courts may grant addiction-based variances for defendants who are less-than-exceptional addicts. District courts need only "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50 (citation omitted). In any event, however, Hendrickson's addiction in this case appears to be extraordinary given how young he was when he started abusing marijuana and methamphetamine, and how directly his criminal history is related to, and influenced by, his addiction.

I acknowledge—as § 3553(a)(5) requires me to—that the Guidelines disfavor addiction-based *departures*. *See* U.S.S.G. §§ 5H1.4 ("Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure."); 5K2.13 ("[T]he court may not depart below the applicable guideline range if . . . the [defendant's] significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants[.]"). But "the standards governing departures do not bind a district court when employing its discretion with respect to variances." *Chase*, 560 F.3d at 832. Although "the Guidelines should be the starting point and the initial benchmark" for a defendant's sentence, *Gall*, 552 U.S. at 49, they are ultimately "merely persuasive authority." *Chase*, 560 F.3d at 832; *see also Pepper*, 131 S. Ct. at 1247 (noting that, in determining an appropriate sentence, district courts may disagree with Guidelines policy statements). And while I must consider Guidelines policy statements under § 3553(a)(5),

they are only one of the § 3553(a) factors I must consider in deciding whether to grant a variance. Where § 3553(a)(5) weighs against addiction-based variances, § 3553(a)(1) weighs in favor of them. "The district court has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges*, 569 F.3d 374, 379 (8th Cir. 2009). For the reasons discussed earlier in this opinion, I consider the mitigating effects of addiction under § 3553(a)(1) to far outweigh any advisory policy statements under § 3553(a)(5). I therefore conclude that Hendrickson's history of addiction justifies a downward variance here.

## III.    CONCLUSION

Ultimately, balancing the § 3553(a) factors requires judges "to weigh that which cannot be measured."[19] This observation is certainly true in this case, which requires me to weigh an intangible—addiction—in arriving at an appropriate sentence. For the reasons discussed above, I find that a sentence of 31 months—6 months below the low end of Hendrickson's Guidelines range—is appropriate. Upon release from prison, Hendrickson will be placed on supervised release for 3 years. In addition to the standard conditions of supervised release, I order that Hendrickson shall participate in, and complete, a substance abuse evaluation as directed by the United States Probation Office, and comply with all recommendations set out in the evaluation, which will hopefully (and, I think, *likely*) include inpatient substance abuse treatment.[20] All other terms and conditions of

---

[19] Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. PA. L. REV. 513, 513 (1993).

[20] I would like to see Hendrickson take part in the Bureau of Prisons's (BOP's) 500-hour residential drug abuse program (RDAP), and recommended that to the BOP. But

Hendrickson's sentence and supervised release were ordered, on the record, at Hendrickson's sentencing hearing.

**IT IS SO ORDERED**.

**DATED** this 11th day of June, 2014.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

Hendrickson likely will not be eligible for that program because his sentence is not long enough. Under _Tapia v. United States_, 131 S. Ct. 2382, 2393 (2011), I "may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." Thus, I do not consider Hendrickson's potential for RDAP placement in imposing his sentence.